# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ernest Jackson,            :
                                   : No. 2267 C.D. 2015
               Appellant : Argued: September 13, 2016
                                   :
              v.                 :
                                   :
Shikellamy School District       :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY SENIOR JUDGE FRIEDMAN             FILED: October 18, 2016

Ernest Jackson appeals from the October 15, 2015, order of the Court of Common Pleas of Northumberland County (trial court), affirming in part the adjudication of the Board of Directors (Board) of the Shikellamy School District (School District), which dismissed Jackson from his temporary position as principal of Shikellamy High School (School). We affirm.

On October 16, 2014, Jackson was a non-tenured, temporary professional employee with the School District, serving as principal of the School. (Board's Findings of Fact, No. 1.) On that day, Jackson opened and searched a student's locker. (*Id.,* No. 5.) Jackson removed a book bag from the locker and, without looking into it, took it with him as he walked down the hallway. (*Id.,* No. 7.) Jackson took the book bag to the cafeteria, where he placed it on a table "and walked approximately forty to sixty feet away from the bag." (*Id.,* No. 8.) Jackson

sat down at a table for a period of time. Jackson then left the cafeteria. (*Id.*) Before leaving the cafeteria, Jackson did not tell anyone that he was leaving the bag on the table; nor did he tell anyone to watch it. (*Id.,* No. 9) When asked why he took the bag to the cafeteria, he testified, "Because that's where I was going." (*Id.*) When Jackson returned to the cafeteria, a cafeteria employee alerted him that the bag had been searched to determine its owner and that a knife was found in it. (*Id.*, No. 11.) Jackson then took the bag containing the knife to his office and contacted the student and his father. (*Id.,* Nos. 12-13.) The student admitted that the knife was his. (*Id.*, No. 13.) Jackson did not have reasonable suspicion prior to searching the student's locker and did not notify the student in advance of the locker search. (*Id.*, No. 5.) Jackson admitted that he regularly and repeatedly searched lockers without notifying students. (*Id.*, No. 6.)

On October 27, 2014, an expulsion[1] hearing was held for the student who had the knife in his book bag. (*Id.,* No. 22.) At that hearing, Jackson testified under oath regarding the discovery of the knife. (*Id.,* No. 23.) He testified that he opened the student's locker, searched the bag at the locker, and found the knife in the bag. (*Id.,* Nos. 24-25.)

On December 12, 2014, the Board issued a Statement of Charges and Notice of Right to Hearing (Notice) to Jackson, listing six charges, which included the three charges at issue in this case. Charge 2 alleged that on October 16, 2014,

---

[1]  The use of this term "expulsion" is somewhat misleading; in fact, total expulsion of the student was never considered. The student was suspended for 10 days. (N.T., 12/22/14, at 76, 79.)

Jackson conducted an unreasonable search of a student's locker, removed a bag and placed the bag in the cafeteria where a cafeteria worker later discovered a knife. Charge 3 alleged that on October 16, 2014, Jackson searched student lockers without authority in violation of applicable school board policy. Charge 4 alleged that on October 27, 2014, Jackson, while under oath at a student expulsion hearing, provided key testimony that was a lie. (Notice at 1-2.) The Notice was signed by the School District superintendent. (*Id.* at 2.) A hearing was held on December 22, 2014. Thereafter, the Board found Jackson guilty of "persistent and willful violation of school laws, persistent negligence, willful neglect of duties and immorality" and terminated his employment. (Board's Hearing Report at 8.) On February 12, 2015, the Board reaffirmed its decision by adopting a Hearing Report, which included its findings of fact, conclusions of law and decision, upholding five of the six charges. (Board's Hearing Report at 1-9.) With respect to the locker searches, the Board concluded:

> Jackson's action of searching students' lockers repeatedly, including the searches he conducted on October 16, 2014, was in violation of 22 Pa. Code §12.14 and Policy 226 and constitutes willful neglect of duties, forming an independent basis for Jackson's dismissal from employment. When this individual violation of policy by Jackson is considered together with Jackson's other violation of policy and applicable law, the conduct is part of a pattern of persistent and willful violation of school laws and persistent negligence in the performance of duties.

(Board's Conclusions of Law, No. 13.) With respect to the false testimony charge, the Board concluded:

> Jackson's actions in lying to the Board, after being sworn in to tell the truth at the student expulsion hearing, when he falsely testified that he searched a locker and found a knife at the time

of that search constitute willful neglect of duties and immorality and forms an independent basis for Jackson's dismissal from employment. When this individual neglect of duty and immorality by Jackson is considered together with Jackson's other violation of policy and applicable law, the conduct is part of a pattern of persistent and willful violation of school laws, persistent negligence in the performance of duties.

(*Id.,* No. 16.)

Jackson appealed to the trial court, claiming *inter alia* that the Board's findings on the charges were not supported by substantial evidence and that the charged conduct was not a basis for his dismissal under the Public School Code of 1949 (School Code), Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§1-101–27-2702. He also asserted that the Board erred in not dismissing all the charges because the Notice was not signed by the Board president and attested by the Board secretary.

In its October 15, 2015 order, the trial court found that charge 1 was not supported by substantial evidence and that charge 6 was not a basis for Jackson's dismissal. However, it sustained the remaining three charges, i.e., charges 2 and 3, relating to Jackson's conducting improper locker searches, including the locker search that later resulted in the discovery of a knife in a student's book bag, and charge number 4, relating to Jackson giving false testimony at the expulsion hearing of the student who had the knife in his book bag. In sustaining the above three charges, the trial court stated that the "willful neglect of duties for repeatedly searching student lockers and willful neglect of duties for lying to the Board, both form independent bases for Appellant Jackson's dismissal." (Trial Ct. Order, 10/15/15, at 2 n.1.)

4

Jackson appealed to this court, raising four issues, which we summarize here as five issues.[2]

1. **<u>Whether substantial evidence supports the Board's finding that Jackson conducted improper locker searches.</u>**

The two charges against Jackson relating to the improper locker searches are:

On or about October 16, 2014, you engaged in the following acts:

a. Without authority, in violation of the rules and regulations against unreasonable search and seizure, and exercising poor judgment, you removed a student's bag from his locker;
b. Exercising extremely poor judgment, you placed the student's bag in the cafeteria and abandoned the bag in the cafeteria;
c. An aide, coming upon the bag that you left on the floor, searched the bag to determine whose bag it was; and
d. Searching the bag, the aide discovered a knife in the bag.

---

[2] Our scope of review of a trial court's decision is limited to determining whether the trial court abused its discretion, committed an error of law, or violated constitutional rights. *Behm v. Wilmington Area School District*, 996 A.2d 60, 64 n.6 (Pa. Cmwlth. 2010). In reviewing the adjudication of the Board, the trial court was limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. *Id.* Section 754(b) of the Local Agency Law, 2 Pa. C.S. §754(b). Because Jackson claims no constitutional error, our review in this case is limited to whether the Board's findings of fact are supported by substantial evidence and whether any error of law was committed.

On or about October 16, 2014, you searched student lockers without authority in violation of applicable law and school board policy.

(Notice at 1.) Jackson argues that the School Board did not show that his searches of lockers were improper, because he had reasonable suspicion for the searches. We disagree.

The applicable School policy is contained in the Pennsylvania Code and School District Policy No. 226. 22 Pa. Code §12.14(c) states:

> Prior to a locker search, students shall be notified and given an opportunity to be present. *When school authorities have a reasonable suspicion that the locker contains materials that pose a threat to the health, welfare or safety of students in the school, student lockers may be searched without prior warning.*

(Emphasis added.) School District Policy No. 226 provides in pertinent part:

> The Board reserves the right to authorize its employees to inspect a student's locker at any time, based on reasonable suspicion, for the purpose of determining whether the locker is being used improperly for the storage of contraband, a substance or object the possession of which is illegal, or any material that poses a threat to the health, welfare or safety of the student population.
>
> *   *   *
>
> Prior to an individual locker search, the student shall be notified and be given an opportunity to be present. This practice shall be followed for school-wide searches using law enforcement officers including specific lockers identified by drug dogs. However, *when school authorities have a reasonable suspicion that a locker contains materials which pose a threat to the health,*

6

> *welfare or safety of the school population, student lockers*
> *may be searched without prior warning.*

(Emphasis added.) (School District Policy No. 226 at 1-2)

There is no question that Jackson searched the lockers without first providing students notice and the opportunity to be present. (Board's Findings of Fact, Nos. 5, 6.) Jackson claims that prior student notification was not necessary because the lockers were unlocked and, therefore, provided reasonable suspicion to believe that they contained "materials that pose a threat to the health, welfare or safety of students in the school." (Jackson's Br. at 16.)

Jackson believes that the searches were justified at their inception because students are informed orally and via the School Handbook that they must keep their lockers secured. Jackson also claims that students "enjoy a **very minimal** expectation of privacy in their lockers." (Jackson's Br. at 18) (emphasis added), citing *Commonwealth. v. Cass*, 709 A.2d 350, 357 (Pa. 1998). In fact, *Cass* does not state that students "enjoy a very minimal expectation of privacy in their lockers," but instead states that, although high school students "do possess a legitimate expectation of privacy in their assigned lockers, that privacy expectation is **minimal**."[3] *Id.* (Emphasis added.)

The searches in *Cass* differ from the searches at issue here. In *Cass*, the high school principal had enlisted a police dog handler with a trained drug-sniffing dog to sniff the outside of 2,000 lockers. *Id.* at 352. Under Pennsylvania's

---

[3] The Court in *Cass* did not distinguish between locked and unlocked lockers.

7

Constitution, dog sniffs constitute a general search.[4]    *Id.* at 357 n.6.   The Pennsylvania Supreme Court explained that general searches are compatible with the limited protection provided to school students under Pennsylvania's Constitution, "so long as they are carried out based upon neutral, clearly articulated guidelines." *Id.* at 365.   The Court stated that, before a school could conduct a canine sniff search, it had to articulate "reasonable grounds for believing that drugs would likely be found on school property." *Id.* at 362 n.13.   The Court concluded that the school district had articulated reasonable grounds including an "increased number of students seeking school sponsored counseling for drug-related problems, concerned phone calls from parents, anonymous student tips regarding drug use, observations by various school personnel of students passing small packages amongst themselves in the hallways, students carrying large sums of money, students in the school displaying physical signs of drug use, students carrying beepers and an increased use of pay phones by students." *Id.* at 357.   In *Cass*, the sniff search by the dogs provided individualized suspicion to open and

---

[4]    In *Cass*, the Pennsylvania Supreme Court recognized that, under the Fourth Amendment of the federal constitution, a dog sniff is not a search but can provide the requisite probable cause or reasonable suspicion for the opening of the sniffed item. 709 A.2d at 357 n.6, relying on *United States v. Place*, 462 U.S. 696 (1983).  However, the Pennsylvania Supreme Court explained that, under the greater protections of Pennsylvania's constitution, a dog sniff is a general search. *Cass,* 709 A.2d at 362 n.13.  The Court specifically found that a warrant was not required prior to a sniff search when the canine is legitimately in the place where the sniff is conducted and "reasonable grounds exist for believing that drugs may be present in the place subjected to the sniff search." *Id.*  Jackson compares his visual scanning of lockers to see if they are locked to a dog's sniff and argues that, like a positive dog sniff under the federal constitution, once he observes the lack of a lock on the locker, reasonable suspicion to search the inside exists. *Id.*  There is no question that his visual scanning of the lockers is not a search.  The question Jackson raises is whether a visual scan that results in observing the lack of a lock provides reasonable suspicion to believe that it contains an item that could pose a threat to the health, safety, or welfare of the school to justify opening and searching the locker.

search 18 lockers, one of which was found to contain marijuana and associated drug paraphernalia. *Id.* at 352.

Jackson's reasons for searching unlocked lockers fall far short of the school district's articulated reasons for the locker searches in *Cass*. Rather than being based on objective, articulable facts, Jackson's reasons are no more than a "hunch,"[5] based on his subjective experience and belief. In contrast to the facts in *Cass*, Jackson argues that the single fact that a student's locker is unlocked provides the requisite reasonable suspicion to search it. He bases that on his personal "experience as an educator" that "tells him that unlocked lockers are used as repositories for drugs and weapons." (Jackson's Br. at 18.) He claims that he "has actually found such things in lockers at Shikellamy and at other schools where he has worked." (*Id.*)

At the time of the searches at issue, Jackson had been an educator for 12 years and the temporary principal at Shikellamy High School for a little under 2 years. (N.T., 12/22/14, at 67.) He testified that, as temporary principal at Shikellamy High School, he searched unlocked lockers "all the time . . . if I see a locker undone, I look inside of it." (*Id.* at 69.) He stated that between 5 to 15 times he had found threats to the health, safety, or welfare of the school in such lockers. (*Id.*) He explained that unsecured lockers have the "potential to be a drop box . . . [A] student can put drugs in somebody's locker that's not secured, make a

---

<sup>5</sup> In *Terry v. Ohio*, 392 U.S. 1, 27 (1968), the United States Supreme Court stated that "due weight must be given, not to [an officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

9

drug deal, and if something goes wrong, he can say it's not my locker . . . . The other thing is that somebody could put a knife or gun in there, and it could be stored there and nobody would know about it, except for the person that put it in, and could cause a serious safety issue . . . ." (*Id.* at 66-67.) Jackson stated that, prior to the knife found on October 16, 2014, he had never found a weapon, but had found "illegal drugs" and "spice." (*Id.* at 87-88.) He admitted to not keeping records of the searches as required by school policy. (*Id.* at 88-89.) Jackson's reasons for searching the unlocked lockers are based on his own subjective beliefs, a hunch, and not on any individualized reasonable suspicion.

Moreover, Jackson's actions on the day the knife was discovered belie his concern for the health, safety, and welfare of the school. After observing the unlocked locker, he opened it, removed a student's book bag and, without opening the bag, took the bag to the cafeteria and put it on a table. He subsequently left the cafeteria and the unattended bag. Had Jackson been concerned for the health, safety and welfare of the school, he would not have removed the bag from the locker and taken it to the cafeteria without first opening it. Nor would he have left the bag unattended in the cafeteria while he attended to other business.

Jackson correctly notes that *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) instructs that whether a search is reasonable is determined first by whether the search was justified at its inception and second by whether the scope of the search was reasonably related to the reason for the search. *See also Cass,* 709 A.2d at 354. Even if Jackson's initial opening of the locker was justified based on

10

the failure to have a lock, Jackson's seizure and removal of the book bag to the cafeteria without first looking inside it exceeded the permissible scope of the search.

Jackson alternatively argues that, even if he lacked reasonable suspicion to search the lockers, he was still entitled to conduct the searches, with the "slim difference" that "the student was entitled to be present for the search." (Jackson's Br. at 20.) Thus, he claims that his only mistake was failing to have the students present for the searches.

Jackson is correct that he could have conducted the searches in accordance with School District Policy No. 226 and 22 Pa. Code §12.14(c) had he first notified the students and given them the opportunity to be present for the search. Given students' legitimate, though minimal, expectation of privacy in their lockers, *Cass,* 709 A.2d at 357, we do not see that as a "slim difference." Instead, we agree with the trial court that substantial evidence supported the Board's finding that Jackson failed to follow School District Policy No. 226 by conducting locker searches without first notifying the students whose lockers were being searched and giving those students an opportunity to be present during the search.

2. **Whether substantial evidence supports the Board's finding that Jackson provided false testimony including whether the charge should have been dismissed because the Board did not maintain a stenographic record of the student's expulsion hearing where the alleged false testimony was made**.

The false testimony charge reads:

11

On or about October 27, 2014 you were sworn in to tell the truth at a student expulsion hearing. Under oath, you provided key testimony that was a lie. You falsely indicated to the Board of Education that you searched a locker and found a knife at the time of that search.

(Notice at 2.)

The Board found and the trial court agreed that Jackson testified falsely at the student's expulsion hearing regarding where he searched the bag and discovered the knife because Jackson made no mention of taking the bag to the cafeteria or of the cafeteria worker finding the knife. No transcript of the expulsion hearing was made. Although the expulsion hearing was recorded, the recorder malfunctioned and the recording is indecipherable. (N.T., 12/22/14, at 96.)

Jackson points out that 22 Pa. Code §12.8(b)(8) requires that a "written or audio record shall be kept of the [expulsion] hearing." Jackson argues that the Board's failure to maintain a stenographic record of the expulsion hearing requires dismissal of the false testimony charge. We agree with the Board and trial court, however, that the record requirement is "for the benefit of the student involved, not for the benefit of other witnesses who testify during such a proceeding." (Trial Ct. Op. at 4.)

As to whether substantial evidence exists to support the Board's finding that Jackson provided false testimony, the School District Solicitor, a School Board member, and the Acting Superintendent testified at Jackson's dismissal hearing that Jackson testified falsely at the student's expulsion hearing. Jackson countered that he had merely read from a prepared statement, which

12

indicated only that a knife had been found and did not identify where or by whom. (N.T., 12/22/14, at 202.) The School Board member testified that the statement that Jackson submitted at his dismissal hearing was different from the one he read from at the student's expulsion hearing. (*Id.* at 115.) All three witnesses testified that, at the expulsion hearing, Jackson testified that, while at the student's locker, he opened the bag and found the knife. Accordingly, we agree with the trial court that the charge of providing false testimony was supported by substantial evidence.

3. **Whether the trial court erred in finding that the Board's adjudication "in its totality" was supported by substantial evidence and/or constitutes a basis for his dismissal.**

In his Questions Presented to this court, Jackson asks whether the trial court erred in finding that the adjudication of the Board "in its totality was supported by substantial evidence and/or constitutes a basis for dismissal in accordance with law." (Jackson's Br. at 4.)

The trial court did **not** find that the Board's adjudication "in its totality" was supported by substantial evidence. The trial court concluded that one charge was not supported by substantial evidence and that another did not constitute a basis for Jackson's dismissal. The trial court's order stated that the three remaining charges constituted "willful neglect" and upheld them. (Trial Ct. Order, 10/15/15, at 2 n.1.) Accordingly, our review of the three remaining charges is limited to determining whether Jackson's conduct constituted willful neglect of his duties.

13

**4.** **Whether the charges constitute willful neglect of duty.**

Jackson argues that, even if the locker searches were improper, his conduct does not constitute "wilful neglect of duties" under section 1122(a) of the School Code, 24 P.S. §11-1122(a). Section 1122(a) of the School Code states that "wilful neglect of duties" is a valid cause for termination of a contract of a professional employee. The School Board and the trial court determined that Jackson's improper locker searches constituted "willful neglect of duties" and, therefore, sufficient basis for Jackson's termination under section 1122(a) of the School Code. We agree.

Jackson argues that his conduct does not constitute willful neglect of duty for several reasons. First, Jackson asserts that section 1122(a) of the School Code was not meant to punish "picayune" offenses. (Jackson's Br. at 14.) Jackson relies on *McFerren v. Farrell Area School District*, 993 A.2d 344, 353 (Pa. Cmwlth. 2010) and *Lauer v. Millville Area School District,* 657 A.2d 119, 121 (Pa. Cmwlth. 1995) for the proposition that dismissal under section 1122(a) of the School Code requires a serious reason, not picayune and unwarranted criticisms.

The Board counters that the picayune offenses standard applies only to tenured professional employees and does not apply to temporary employees like Jackson. *McFerren* and *Lauer*, as well as our more recent decision in *Hertzler v. West Shore School District,* 78 A.3d 706 (Pa. Cmwlth. 2013), involved tenured professional employees, as opposed to temporary professional employees. In *Lauer,* we explained that "the legislature intended to protect tenure except for the

14

serious charges listed" in section 1122(a) of the School Code. 657 A.2d at 121.[6] However, even if the dismissed employee is a temporary professional employee like Jackson, the Board still must prove that the charged conduct constitutes a "valid cause" for dismissal under section 1122(a) of the School Code. Thus, in this case, we must be satisfied that the improper locker searches and false testimony constitute "willful neglect."

Second, Jackson claims that the improper locker searches were not willful because, although he often searched unlocked lockers, he was not previously disciplined for the practice. However, there was no evidence that the School District was aware of Jackson's practice of searching unlocked lockers.

---

[6] The charges that the courts in *McFerren* and *Lauer* considered were claimed to constitute "persistent negligence" or persistent violation of school law under section 1122(a) of the School Code. In those cases, the school employees were charged with a series of separate but minor infractions that when accumulated over time were alleged to constitute "persistent" conduct. In both those cases, the courts found that the school districts had not met their burden of proving that the conduct, even if true, was persistent. The *Lauer* court held that charges such as being too lenient, yelling to maintain order, giving too much homework, and making several inappropriate comments over a four-year period did not constitute "persistent negligence" by a teacher of almost 22 years. 657 A.2d at 122. In *McFerren,* the court held that two incidents over two and a half years did not satisfy the requirement of "persistency." 993 A.2d at 359. More recently, in *Hertzler v. West Shore School District,* 78 A.3d 706, 712 (Pa. Cmwlth. 2013) (citation omitted), we stated that, where a principal is disciplined for negligent performance of a specific duty, "'the negligent performance must be serious, not picayune.'" In contrast to the negligence and persistent conduct in *Hertzler, McFerren,* and *Lauer,* in this case, the only remaining charges against Jackson (the specific acts of improper locker searches that occurred on October 16th and the false testimony) relate to "willful neglect of duty" under section 1122(a).

Third, Jackson contrasts his conduct to that described in *Flickinger v. Lebanon School District,* 898 A.2d 62 (Pa. Cmwlth. 2006), where this court affirmed the dismissal for willful neglect of duties of a principal who failed to promptly respond to a report that a student in the school had a gun. Jackson asserts that, unlike the principal in *Flickinger,* whose neglect of duties put the school population in danger, Jackson acted "to remove a knife from the student population." (Jackson's Br. at 21.) Because his improper searches resulted in a knife being found in one locker, Jackson believes that he should be "commended," rather than "condemned." (*Id.* at 21.)

It is axiomatic that the evidence uncovered by an improper search may not be considered in determining whether the requisite cause for the search existed. *See Commonwealth v. Hicks*, 253 A.2d 276, 280 (Pa. 1969). Here, Jackson is basically arguing that the end justifies the means, as he attempts to justify the improper locker searches by the fact that a knife was eventually discovered in one locker.

Also, Jackson overstates the danger to the student population posed by the knife that was found in the student's locker. In *In re Expulsion of A.D. from United South Central Public Schools,* 883 N.W.2d 251, 253 (Minn. 2016) (citation omitted), the Minnesota Supreme Court found that a pocketknife's presence in the unlocked locker of a student did not "bring the student or others 'into danger.'"

In that case, the court held that the mere presence of a forgotten pocketknife in a student's purse in an unlocked locker was not a danger to the

school population. *Id.* at 263. There, school officials had used a drug-sniffing police dog to conduct a general search of lockers. The dog alerted on A.D.'s unlocked locker, providing reasonable suspicion to open it. When the school official searched A.D.'s unlocked locker, he observed a pocketknife in the side pocket of a purse that was hanging in the locker. Like the student in this case, who explained that he had taken the knife on an outing over the weekend and left it in his bag by accident, A.D. admitted the knife was hers, explaining that she had used it over the weekend and forgot that she left the knife in her purse. *Id.*

A.D. was given a notice of suspension charging her with conduct that endangered her or others. *Id.* at 254. The school district, like Jackson in this case, maintained that "the mere presence of a weapon on school grounds, despite the fact that no one knew of its presence and no one could have accessed the pocketknife without going through A.D.'s purse in her locker, endangered the safety of the student and others." *Id.* at 262-63. The Court rejected that assertion, explaining:

> Although A.D.'s locker was unlocked on the day of the search, the school liaison officer conceded that there was no evidence that A.D. told anyone of the pocketknife's presence, displayed the pocketknife, or removed the pocketknife from her purse at any time. There likewise is no evidence in the record that anyone even knew the knife was there or talked about it before the officer secured it.
>
> Based on the record, which does not reflect that any student or staff member was even aware of the presence of the pocketknife or that any student or staff member had reason to access A.D.'s locker and discover the knife's presence, the risk and possibility of harm is too tenuous to constitute substantial evidence of endangerment. The record is simply devoid of evidence that

17

suggests endangerment results from the mere presence of a forgotten 3-inch pocketknife.

*Id.* at 263.

Moreover, as stated previously, Jackson's actions of removing the bag from the locker and leaving it unattended on the cafeteria table while he attended to other business are inconsistent with a concern for the safety of the student population.

*Flickinger* is instructive on what constitutes "willful neglect of duties." In that case, the principal claimed that his failure to respond to the report of a gun could not be willful because, at the time he received the report, he was dealing with a fight and believed that the gun matter was being handled by his assistants. *Flickinger,* 898 A.2d at 66-67. The court explained that under section 1122(a), "a willful neglect of duties" may be defined "'as an intentional disregard of duties by that employee.'" *Id.* at 67 (citation omitted).

Where a school district policy serves as the basis for termination, the school district must show that the employee knew of the policy and "deliberately chose not to comply." *McFerren,* 993 A.2d at 357. Here, the school policy was clear and required that, unless school authorities had reasonable suspicion that a locker contained materials that pose a threat to the health, welfare, or safety of the school population, the students were to be given notice and an opportunity to be present before their lockers were opened.

18

Jackson next contends that there was no evidence that he received training on the search policies or that he was even aware of the policies. Jackson, however, testified at his dismissal hearing that he had read the school board policy dealing with locker searches. (N.T., 12/22/14, at 35-36.) When asked at that hearing if the policy had "a provision that requires students to be notified prior to their locker being searched . . . ," he replied, "[t]hat's in there." (*Id.* at 36.) Accordingly, we conclude that Jackson's opening lockers without first notifying the students whose lockers he was searching and providing them an opportunity to be present was an intentional disregard of his duties and therefore constitutes willful neglect.

Likewise, Jackson's providing testimony at the student's expulsion hearing that he searched the bag and found the knife at the locker when he knew that was not true was an intentional disregard of his duties and, therefore, constitutes willful neglect.

Finally, we agree with the trial court that, where multiple grounds for dismissal are alleged, dismissal will be upheld even if only one of the grounds is adequately proven. *See Monaghan v. Board of School Directors of Reading School District*, 618 A.2d 1239, 1243 (Pa. Cmwlth. 1992).

5. **Whether the Notice was legally deficient because it was not signed by the president and attested by the secretary of the School Board.**

Jackson contends that his dismissal was invalid because the Notice was not "signed by the president and attested by the secretary of the board of

19

school directors," as required by section 1127 of the School Code, 24 P.S. §11-1127. He argues that the trial court erred by not determining that the Board committed legal or procedural error when it determined that the requirements of section 1127 of the School Code were inapplicable to Jackson because he was a temporary professional employee.

Jackson argues that section 1127 of the School Code applies to temporary employees because section 1108(d) of the School Code, states that "[t]emporary professional employes shall for all purposes, except tenure status, be viewed in law as full-time employes, and shall enjoy all the rights and privileges of regular full-time employes."

The Board counters that section 1127 of the School Code does not apply to Jackson because he is a temporary professional employee. We agree. Section 1127 of the School Code unequivocally states that it applies only to tenured employees. It sets out the procedure for dismissals of professional employees "having attained a status of permanent tenure." *Id.* Clearly, Jackson is not a tenured professional employee.

Instead, the Board points out that the procedures under the Local Agency Law, 2 Pa. C.S. §553, apply and require only reasonable notice of a hearing and an opportunity to be heard. We agree that the procedure for dismissal of temporary professional employees, like Jackson, is under the Local Agency Law. In *Young v. Littlestown Area School District*, 358 A.2d 120, 124 (Pa. Cmwlth. 1976), this court explained that the Local Agency Law provides a

statutory remedy for temporary professional employees to contest dismissals. In *Smith v. Board of School Directors of the Harmony Area School District*, 328 A.2d 883, 884-85 (Pa. Cmwlth. 1974), we held that section 1127 of the School Code applies only to professional employees and that the Local Agency Law covered temporary professional employees. The Local Agency Law, as the School District points out, does not require that the notice be signed by the board president and attested by the secretary; rather, it requires only that there be "reasonable notice of a hearing and an opportunity to be heard." 2 Pa. C.S. §553. The Notice provided to Jackson satisfied those requirements.

       Accordingly, for these reasons, we affirm.

_____
ROCHELLE S. FRIEDMAN, Senior Judge

21

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ernest Jackson,                           :
                                          : No. 2267 C.D. 2015
                    Appellant             :
                                          :
            v.                            :
                                          :
Shikellamy School District               :

O R D E R

AND NOW, this 18<u>th</u> day of <u>October</u>, 2016, we hereby affirm the October 15, 2015, order of the Court of Common Pleas of Northumberland County.

_____
ROCHELLE S. FRIEDMAN, Senior Judge